UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. |
| | : | 3:16-CR-00148 (VLB) |
| v. | : | |
| | : | |
| EDWARD KOSINSKI | : | August 16, 2017 |

## Memorandum of Decision Denying Defendant's Motion to Dismiss the Indictment

Before the Court is Defendant's Motion to Dismiss the Indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3). For the reasons that follow, the Defendant's Motion is DENIED.

I. **Background**

On August 3, 2016, a federal grand jury sitting in New Haven, Connecticut returned an indictment against Defendant Edward Kosinski charging him with two counts of Insider Trading in violation of 17 C.F.R. Section 240.10b-5 and 15 U.S.C. Sections 78j(b) and 78ff. [Dkt. 1 (Indictment).] The Indictment alleges as follows.

Throughout the relevant time period, Defendant was a resident of Weston, Connecticut and the president of President of Connecticut Clinical Research, LLC ("CCR"), located in Bridgeport, Connecticut. Indictment at ¶ 1. Regado Biosciences, Inc. ("Regado") is a publicly traded biopharmaceutical company incorporated in Delaware and principally located in New Jersey. *Id.* at ¶ 2. From approximately September 2013 through June 2014, Regado enrolled patients in a clinical trial to study the efficacy of a clinical drug candidate (the "Trial"). *Id.* at ¶

3.  Regado hired the Cleveland Clinical Coordinating Center for Clinical Research ("C5 Research") to coordinate and manage the Trial.  *Id*.

On or about June 12, 2013, Defendant, on behalf of CCR, entered into a Confidential Disclosure Agreement (the "Disclosure Agreement") with Regado.  The Disclosure Agreement granted CCR the right to receive confidential, proprietary information to "evaluate CCR's interest in participating in the Trial," and required CCR to "treat the information received confidentially and not disclose such information" without Regado's prior written consent.  *Id*. at ¶ 4.

On or about January 29, 2014, Defendant entered into a Clinical Study and Research Agreement (the "Research Agreement") with C5 Research, an authorized agent of Regado.  *Id*. at ¶ 5.  Defendant executed the Research Agreement both individually, as a principal investigator, and on behalf of CCR.  *Id*.  The Research Agreement required CCR and Defendant to "maintain in strict confidence all confidential information . . . provided by C5 Research or Regado during the course of the Trial."  *Id*.

Between approximately October 2013 and May 2014, Defendant purchased 40,000 shares of Regado common stock.  *Id*. at ¶ 6.  On or about June 29, 2014, C5 Research informed Trial investigators and coordinators, including Defendant, that several Trial participants had allergic reactions to the clinical drug candidate.  *Id*. at ¶ 8.  As a result, C5 Research indicated it would accept no new Trial participants until July 2, 2014 and the Data and Safety Monitoring Board would assess the Trial.  *Id*.  This information was confidential, non-public and material.  *Id*.

On or about the following day, June 30, 2014, Defendant sold his $40,000 shares of Regado common stock for between $6.59 and $7.00 per share, for a total of approximately $272,561.  *Id.* at ¶ 9.  He did so knowingly, willfully, with intent to defraud, and in violation of a duty of trust and confidence owed to Regado and C5 Research.  *Id.*

On July 2, 2014, the closing price of Regado common stock was $6.76.  *Id.* at ¶ 10.  After the stock market closed that day, Regado publicly announced that participant enrollment in the Trial was paused pending the Data and Safety Monitoring Board's assessment.  *Id.* at ¶ 10.  On July 3, 2014, the closing price of Regado common stock was $2.81.  *Id.* at ¶ 11.  By selling his stock before July 2, 2014, Defendant avoided a loss of approximately $160,000.  *Id.*

On July 29, 2014, C5 Research informed Defendant and other investigators and study coordinators that a Trial participant had died and the Trial was on hold pending the Data and Safety Monitoring Board's assessment.  *Id.* at ¶ 14.  The information was confidential, non-public, and material.  *Id.*

Approximately two days later, on or about July 31, 2014, Defendant purchased 50 Regado put-option contracts with a strike price of $2.50 and an expiration date of October 18, 2014.  *Id.* at ¶ 15.  This gave Defendant the right to sell 5,000 shares of Regado common stock on or before October 18, 2014 for $2.50 per share.  *Id.*  He did so knowingly, willfully, with intent to defraud, and in violation of a duty of trust and confidence owed to Regado and C5 Research.  *Id.*  The closing price of Regado common stock that day was $2.98.  *Id.* at ¶ 16.

On or about August 25, 2014, Regado publicly announced that it had permanently halted the Trial. *Id.* at ¶ 17. Over the course of that day, Regado common stock prices fell to $1.13 per share. *Id.* Approximately three days later, on or about August 28, 2014, Defendant purchased 5,000 shares of Regado common stock for approximately $1.13 per share. *Id.* at ¶ 18. Defendant then exercised his put option, selling his 5,000 shares for $2.50 per share and netting a profit of over $3,000. *Id.*

Defendant self-surrendered and was arraigned on August 4, 2016. [Dkt. 4.] Defendant entered a $500,000.00 non-surety bond and agreed to conditional pre-trial release. [Dkts. 5, 6.]

## II. Standard for Dismissal of an Indictment

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). An indictment is valid if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States,* 418 U.S. 87, 117 (1974)).

When identifying the elements of a crime of indictment, courts look to "the language employed by Congress" in the applicable statute and assume "the ordinary meaning of the language accurately expresses the legislative purpose." *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012). While an indictment

must allege all of the elements of the crime of indictment, it has "never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses." *United States v. Sisson*, 399 U.S. 267, 288 (1970).

When determining whether an indictment asserts facts to fulfill each element of the crime alleged, courts accept as true the allegations in the charging document. *Alfonso,* 143 F.3d at 776-77. An indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999). However, courts have "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id*. at 44. "[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment" unless "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *Alfonso*, 143 F.3d at 776-77; *see also Costello,* 350 U.S. at 363 ("If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great.").

III.  Analysis

Defendant moves to dismiss the Indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3). Specifically, Defendant asserts the Indictment fails to allege a duty of trust and confidence prohibiting Defendant from trading securities based on confidential information concerning the Trial. The Government opposes Defendant's Motion.

a. **The Duty of Trust and Confidence**

The Indictment alleges Defendant violated the Securities Exchange Act of 1934 as codified at 15 U.S.C. Sections 78j(b) and 78ff,[1] and SEC Rule 10b-5, codified at 17 C.F.R. 240.10b-5.  15 U.S.C. Section 78j(b), which codifies Section 10(b) of the Securities Exchange Act of 1934,[2] prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  Pursuant to this section, the SEC promulgated Rule 10b–5 which provides in pertinent part:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, [or] . . . (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 CFR § 240.10b–5 (1979); *see also Chiarella v. United States*, 445 U.S. 222, 225-26 (1980) (explaining the relation between 15 U.S.C. Section 78j(b) and Rule 10b-5).

---

[1] 15 U.S.C. Section 78ff states anyone who willfully violates the Securities Exchange Act of 1934 "shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both."
[2] 15 U.S.C. Section 78j codifies Section 10(b) of the Securities Exchange Act of 1934, which prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  Courts often reference violations of 15 U.S.C. Section 78j(b) as Section 10(b) violations; the Court will so reference them here.

A person who uses non-public information for his own benefit in securities trading commits a "fraud" in two instances. First, under the "classical" theory, a fiduciary[3] of a corporation commits a fraud by violating a duty to disclose or abstain from trading on confidential information obtained because of the fiduciary's position with the corporation. *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). The duty arises out of the "relationship of trust and confidence" which exists between a corporation's shareholders and fiduciaries. *Id.*

Second, under the "misappropriation" theory, an individual commits a fraud by violating a duty to disclose or abstain from trading on confidential information obtained from a source with whom the individual has a relationship of trust and confidence. *O'Hagan,* 521 U.S. at 652. The relationship of trust and confidence is not created "unilaterally, by entrusting a person with confidential information" but rather when "there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties." *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (citing *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991)). A "similar relationship of trust and confidence" exists where the parties have the "functional equivalent of a fiduciary relationship," namely, when the beneficiary of the relationship "rel[ies] on a

---

[3] A fiduciary of a corporation is a "corporate insider, such as an officer of the corporation," who has "obtained confidential information by reason of [his] position with that corporation." *United States v. Falcone,* 257 F.3d 226, 229 (2d Cir. 2001).

fiduciary to act for his benefit" and in doing so "entrust[s] the fiduciary with custody over property of one sort or another." *Chestman*, 947 F.2d at 569.

### b. The Confidentiality Agreements Create a Duty of Trust and Confidence

Both parties agree the Indictment relies on the misappropriation theory. [Dkt. 26 (Motion to Dismiss); Dkt. 31 (Opposition).] However, the parties disagree as to whether the Research Agreement and Disclosure Agreement (together, the "Confidentiality Agreements") created a relationship of trust and confidence which prohibited Defendant from trading on confidential information concerning the Trial. The disagreement concerns 17 C.F.R. Section 240.10b5-2(a) (hereafter "Rule 10b5-2"), which "provides a non-exclusive definition of circumstances in which a person has a duty of trust or confidence for the purposes of the 'misappropriation' theory of insider trading under Section 10(b) of the Act and Rule 10b-5." Rule 10b5-2 Preliminary Note. One of the circumstances creating a "duty of trust or confidence" is "[w]henever a person agrees to maintain information in confidence." Rule 10b5-2(b).

The Government asserts Defendant owed **Regado** and **C5 Research** a duty of trust and confidence under Rule 10b5-2. Defendant argues Rule 10b5-2 establishes no such duty for three reasons: (i) Rule 10b5-2 is not cited in the Indictment; (ii) the wording of Rule 10b5-2 does not track exactly the language in the Supreme Court's definition of misappropriation liability; and (iii) affording Rule 10b5-2 its plain meaning would impermissibly extend the reach of Section 10(b). The Court addresses each argument in turn.

First, Defendant asserts that Rule 10b5-2 does not apply because it is not cited in the Indictment. Rule 10b5-2 applies to "any violation of Section 10(b) of the Act (15 U.S.C. 78j(b)) and § 240.10b-5 thereunder that is based on the purchase or sale of securities on the basis of, or the communication of, material nonpublic information misappropriated in breach of a duty of trust or confidence." Rule 10b5-2(a). The rules of statutory construction direct courts to assign a statute meaning according to the plain language of terms. *See Aleynikov*, 676 F.3d at 76. Accordingly, the Court construes Rule 10b5-2 as applying to "any" violation of the type described therein even where, as here, the indictment does not cite Rule 10b5-2. This interpretation is consistent with other courts within the Second Circuit. *See, e.g. U.S. v. Corbin*, 729 F. Supp. 2d 607, 615 (S.D.N.Y. 2010) (finding an indictment under Section 10(b) and Rule 10b-5 which asserted the defendant agreed to maintain information in confidence sufficiently alleged "a duty of trust or confidence for the purposes of maintaining a prosecution based on misappropriation theory under Rule 10b5-2(b)(1)").

Second, Defendant asserts that Rule 10b5-2 could not inform the application of Section 10(b) because Rule 10b5-2 states a "duty of trust *or* confidence exists . . . [w]henever a person agrees to maintain information in confidence," while the misappropriation theory requires a "duty of trust *and* confidence." *See* Rule 10b5-2(a) (emphasis added); *O'Hagan*, 521 U.S. at 652 (emphasis added). The rules of statutory construction dispose of this argument as well. The Court must consider the statute as a whole and consult its relevant legislative history to determine its meaning. *Interstate Commerce Comm'n v. J.T.*

*Transport Co.*, 368 U.S. 81, 107 (1961). Rule 10b5-2 repeatedly states it is intended to apply to Section 10(b) and the misappropriation theory. *See* Rule 10b5-2 Preliminary Note, subsection (a). In addition, the SEC's Executive Summary of Rule 10b5-2 states Rule 10b5-2 is intended to resolve disagreements among the courts regarding the application of Section 10(b) and Rule 10b-5. *See* Final Rule: Selective Disclosure and Insider Trading, Exchange Act Release Nos. 33-7881, 34-43154 (Oct. 23, 2000) at Section III (hereafter "Final Rule"). Despite the statute's wording and the SEC's intent in enacting Rule 10b5-2, Defendant asserts the phrase "trust *or* confidence" renders it inapplicable to Section 10(b). The Court shall not read Rule 10b5-2 to include such an internal contradiction. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989) (holding a statute should be upheld according to its plain meaning if it is "coherent and consistent").

Finally, Defendant asserts Rule 10b5-2 extends beyond the scope of Section 10(b) by creating liability where there is a confidentiality agreement but no agreement not to trade upon the confidential information. In support of this argument, Defendant cites *SEC v. Cuban*, 634 F. Supp. 2d 713 (N.D. Tex. 2009) (vacated on other grounds). The *Cuban* Court determined that an agreement which only expressly prohibits disclosing confidential information does not also create a duty not to trade securities based on that information. *Id.* at 728. Because trading on the information would not violate the strict terms of the confidentiality agreement, the *Cuban* Court reasoned such trading would not constitute "deception." *Id.* As Section 10(b) gave the SEC authority to proscribe

conduct that is "manipulative or deceptive," the *Cuban* Court concluded Section 10(b) does not contemplate prohibiting securities trading where only a confidentiality agreement exists. *Id.* (citing Section 10(b)). The *Cuban* Court accordingly concluded Rule 10b5-2 exceeds the scope of Section 10(b). *Id.*

The Court declines to find that affording Rule 10b5-2 its plain meaning would impermissibly extend beyond Section 10(b). "When a court reviews an agency's construction of the statute which it administers," the court must consider "whether Congress has directly spoken to the precise question at issue." *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). Where the statute does not speak directly to the precise question, but rather leaves "ambiguity in [the] statute meant for implementation by an agency," the court must uphold the agency's interpretation if it "is based on a permissible construction of the statute." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (discussing *Chevron*, 467 U.S. at 843). An interpretation is "permissible" if it is "a reasonable policy choice for the agency to make." *Id.* at 986.

Section 10(b) does not state what duties, if breached through "manipulation or deception," create misappropriation theory liability. *See supra* note 2 (text of Section 10(b)). Accordingly, if the SEC's interpretation of those duties as including the duty to maintain information in confidence is "a reasonable policy choice," the Court shall uphold it.

The Court finds the SEC's interpretation reasonable. The SEC's interpretation is consistent with this Circuit's precedent which, both before and

after Rule 10b5-2's enactment, recognized that a confidentiality agreement creates a duty of trust and confidence under the misappropriation theory. In 1991, the Second Circuit recognized two avenues for establishing a duty of trust and confidence under the misappropriation theory: an "express agreement of confidentiality" or a "pre-existing fiduciary relation . . . or its functional equivalent." *Chestman*, 947 F.2d at 571. Six years later, the Supreme Court affirmed that an individual violates Section 10(b) "when he misappropriates confidential information for securities trading purposes." *O'Hagan*, 521 U.S. 642, 643 (1997). When the SEC enacted Rule 10b5-2, it considered "the fundamental unfairness of insider trading" and Congress's "strong support for [the SEC's] insider trading enforcement program," and found the misappropriation theory as described in *O'Hagan* was "consistent with the animating purpose of the federal securities laws." Final Rule at Section III. The SEC also cited *Chestman* in its Executive Summary of Rule 10b5-2 as part of the regime of case law upon which the Rule was based. *Id.* at Section III(b)(1). After Rule 10b5-2's enactment, courts within the Second Circuit have continued to recognize that confidentiality agreements create a duty under the misappropriation theory.[4] *See, e.g.*, *U.S. v. Falcone*, 257 F.3d 226, 233 (2d Cir. 2001).

---

[4] The cases within the Second Circuit which Defendant cites do not hold otherwise. *See Nolan Bros. of Texas, Inc. v. Whiterhaven, LLC*, 2004 WL 376265 at *1 (S.D.N.Y. 2004) (stating a confidentiality agreement does not necessarily create a fiduciary relationship between the parties to a civil contract); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220 (S.D.N.Y. 1991) (holding the receipt of confidential information without a confidentiality agreement does not create a duty not to trade on the information); *United States v. Cassesse*, 273 F. Supp. 2d 481 (S.D.N.Y. 2003) (finding an unsigned

Further, the SEC promulgated Rule 10b5-2 in 2002. Despite *Cuban* and its contrary application of the Rule, Congress has not enacted clarifying legislation limiting the reach of Rule 10b5-2. Rather, Congress has allowed the SEC to continue to apply Rule 10b5-2 as it is written. This indicates a congressional affirmance of the Rule as appropriate in scope.

The Court finds the SEC's interpretation of Section 10(b) in Rule 10b5-2 a "reasonable policy choice" and rejects Defendant's final argument against applying the Rule here. *See also United States v. Corbin*, 729 F. Supp. 2d 607, 617-19 (finding Rule 10b5-2 did not exceed the SEC's rulemaking authority under *Chevron* analysis). Defendant's Motion to Dismiss for failure to allege a duty of trust and confidence through the Confidentiality Agreements is DENIED.

   a. <u>Whether a Fiduciary-Like Relationship Creates a Duty of Trust and Confidence</u>

The parties also disagree as to whether the Indictment alleges a fiduciary-like relationship between Defendant and Regado and C5 Research. As stated above, a person has a duty of trust and confidence under the misappropriation theory if he or she and the source of the information have an "express agreement of confidentiality" or a "pre-existing fiduciary relation . . . or its functional equivalent." *Chestman*, 947 F.2d at 571. The Government asserts even if Defendant's confidentiality agreement did not create a duty not to trade on shared non-public information under Rule 10b5-2, the Defendant and C5 Research had a fiduciary-like relationship creating liability under the

---

confidentiality agreement does not create a duty of trust and confidence under the misappropriation theory).

misappropriation theory. The Government points to Defendant's role as an investigator in C5 Research's clinical trials as the basis for the fiduciary-like relationship. Defendant responds that an investigator is independent from the entity sponsoring a clinical trial, and has a fiduciary relationship not with the entity sponsoring the trial (C5 Research) but with an independent institutional review board.

The indictment provides limited information about Defendant's relationship with C5 Research, stating only that CCR entered into the Disclosure Agreement "to evaluate CCR's interest in participating in the Trial," and that C5 Research provided information regarding the Trial to "Investigators and Study Coordinators, including Kosinski." Indictment ¶¶4, 8. Defendant asks the Court to determine whether Defendant and CCR were independent of C5 Research, or whether Defendant "obtain[ed] access to [information regarding the Trial] to serve the ends of the fiduciary relationship, [and] . . . bec[ame] duty-bound not to appropriate the property for his own use." *Chestman*, 947 F.2d at 569.

The sole authority Defendant cites to assert his legal independence from C5 Research is a case stating "the investigator who recruits the subjects, determines their suitability, monitors their tolerance and reaction and reports the results" is independent from the sponsoring enterprise and answers only to his or her "institutional review board." *Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 488 (S.D.N.Y. 2006). The indictment does not allege that Defendant had such a role on C5 Research's drug trial.

Even if Defendant did have the investigatory role contemplated in *Suthers*, Defendant obscures the fact that the Indictment alleges he entered into two independent confidentiality agreements. In the Disclosure Agreement, Defendant, on behalf of CCR, contracted with Regado to receive information about the Trial to "evaluate CCR's interest in participating in the Trial," and agreed to "treat the information received confidentially." Indictment at ¶ 4. In the Research Agreement, Defendant, both individually and on behalf of CCR, contracted with C5 Research as agent of Regado. *Id.* at ¶ 5. The Indictment does not state the terms of the Research Agreement other than that it required Defendant and CCR to "maintain in strict confidence all confidential information . . . provided by C5 Research or Regado during the course of the Trial." *Id.*

Defendant conflates the interests of Regado and C5 Research and his distinct duty to each under each agreement. While the evidence may show that Defendant was responsible for "recruit[ing] the subjects, determin[ing] their suitability, monitor[ing] their tolerance and reaction and report[ing] the results" of the Trial (*Suthers*, 411 F. Supp. 2d at 488), such evidence would not nullify his duty under each agreement to maintain Trial-related information in confidence. In addition, such evidence may not nullify other fiduciary-like duties under the Disclosure Agreement or Research Agreement which are yet to be discovered, as the parties have not produced either agreement to the Court.

Defendant asks the Court to "look beyond the face of the indictment and dr[aw] inferences as to the proof that would be introduced by the government at trial" to establish the duty of trust and confidence. *Alfonso*, 143 F.3d at 776.

"[S]uch an inquiry into the sufficiency of the evidence" on a motion to dismiss would be "premature . . . [u]nless the government ha[d] made what can fairly be described as a full proffer of the evidence it intends to present at trial" to establish the duty of trust and confidence, which it has not done here. *Id.* The Court may not weigh the sufficiency of potential evidence at this juncture; Defendant's Motion to Dismiss on the ground that he did not have a fiduciary-like relationship with C5 Research is DENIED.

IV. <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion to Dismiss the Indictment is DENIED.

It is so ordered this 16th day of August 2017, at Hartford, Connecticut.

_____/s/_____

Vanessa L. Bryant, U.S.D.J.